# United States Tax Court

T.C. Memo. 2024-12

CYNTHIA L. HUFFMAN AND ESTATE OF CHET S. HUFFMAN,
DECEASED, CYNTHIA L. HUFFMAN, EXECUTOR, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

—————

Docket Nos. 3255-16, 3256-16,          Filed January 31, 2024.
3261-16, 3526-16.

—————

*Jonathan N. Kalinski*, *Robert Samuel Horwitz*, *Edward M. Robbins, Jr.*,
and *Evan J. Davis*, for petitioners.

*Aely K. Ullrich*, *Alan H. Cooper*, *D. Anthony Abernathy*, and *Trent D.
Usitalo*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, *Judge*: The Internal Revenue Service (IRS or
respondent) determined the following deficiency in federal gift tax and
additions to tax for R. Lloyd (Lloyd) Huffman's[2] 2007 taxable year:

—————

[1] Cases of the following petitioners are consolidated herewith: Infinity
Aerospace Inc., Docket No. 3256-16; Estate of R. Lloyd Huffman, Deceased, Raymond
Lance Huffman, Executor, Docket No. 3261-16; and Patricia Huffman, Docket No.
3526-16.

[2] After trial Lloyd died and was substituted for in this proceeding by his
executor, Raymond Lance Huffman.

**[*2]**

| Year | Deficiency | Additions to Tax | |
|---|---|---|---|
| | | § 6651(a)(1)[3] | § 6651(a)(2) |
| 2007 | $3,727,337 | $838,651 | $931,834 |

The IRS determined the following deficiencies in federal gift tax and additions to tax for Patricia (Patricia) Huffman's 2007 taxable year:[4]

| Year | Deficiency | Additions to Tax | |
|---|---|---|---|
| | | § 6651(a)(1) | § 6651(a)(2) |
| 2007 | $3,727,337 | $838,651 | $931,834 |
| | 10,297,337 | 2,316,901 | 2,574,334 |

The IRS determined the following deficiencies in income tax, additions to tax, and penalties for Chet S. (Chet) and Cynthia L. (Cindy) Huffman's[5] 2008 and 2009 taxable years:

| Year | Deficiency | Additions to Tax/Penalties | |
|---|---|---|---|
| | | § 6651(a)(1) | § 6662(a) |
| 2008 | $284,489 | – | $56,898 |
| 2009 | 6,842,147 | $1,591,748 | 1,368,429 |

---

[3] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts are rounded to the nearest dollar.

[4] The IRS issued two deficiency notices to Patricia for her 2007 taxable year.

[5] After trial Chet died and was substituted for in this proceeding by his executor, Cindy.

[*3]    The IRS determined the following deficiencies in income tax, additions to tax, and penalties for Infinity Aerospace, Inc.'s (Dukes's)[6] 2008–10 taxable years:

| Year | Deficiency | Additions to Tax/Penalties | |
|---|---|---|---|
| | | § 6651(a)(1) | § 6662(a) |
| 2008 | $1,411,852 | $352,963 | $282,370 |
| 2009 | 481,084 | 133,635 | 96,217 |
| 2010 | 13,031,561 | 5,693,794 | 2,606,312 |

After certain concessions by the parties in the Cindy and Estate of Chet S. Huffman case and in the Dukes case,[7] the issues remaining for decision are whether (1) Patricia and the Estate of Lloyd Huffman made a taxable gift to Chet in 2007; (2) Patricia made a taxable gift to Chet in 2007; (3) Patricia and the Estate of Lloyd Huffman are liable for

---

[6] Infinity Aerospace was formerly known as Dukes, Inc.; for convenience we will throughout this Opinion refer to this corporation as Dukes.

[7] By way of a Stipulation of Settled Issues in the Cindy Huffman and Estate of Chet S. Huffman case, the parties agree that Chet (now deceased) and Cindy are (1) entitled to deduct losses on Schedules E, Supplemental Income and Loss, of $580,310 and $379,481 for 2008 and 2009, respectively; (2) not entitled to a section 166 bad debt deduction of $571,000 nor a $571,000 capital loss deduction for 2008; (3) not entitled to a section 170 charitable contribution deduction of $120,000 for 2008; and (4) not subject to an increase in ordinary dividend income of $120,000 from Dukes for 2008.

By way of a Stipulation of Settled Issues in the Dukes case, the parties agree that (1) as part of the computation of "Capital Gain Net Income – Schedule D," the amount of "Cost or other basis of property sold" reflected on the Form 886–A, Explanation of Items, attached to the notice of deficiency is increased to $18,079,778 for 2010; (2) Dukes is not entitled to deductions for legal and professional expenses of $306,430, $152,875, and $87,727 for 2008–10, respectively; (3) Dukes is not entitled to deductions for depreciation of $318,973, $644,250, and $104,148 for 2008–10, respectively; (4) Dukes is not entitled to costs of goods sold of $587,239, $319,244, and $63,544 for 2008–10, respectively; (5) Dukes is entitled to a net gain reduction of $2,037,398 for 2010; (6) Dukes is entitled to a net operating loss carryback of $2,578,291 from 2011 to either 2009 or 2010; and (7) Dukes is entitled to section 170 charitable contribution deductions of $20,000 and $100,000 for 2008 and 2009, respectively.  Additionally, on brief in the Dukes case, respondent concedes that the section 6651(a)(1) addition to tax for 2010 should be reduced to $2,842,544.

[*4] additions to tax pursuant to section 6651(a)(1) and (2) for 2007; (4) Cindy and the Estate of Chet Huffman had ordinary dividend income relating to the sale of Dukes to TransDigm, Inc. (TransDigm), in 2009; (5) Cindy and the Estate of Chet Huffman are liable for accuracy-related penalties under section 6662 for 2008 and 2009; (6) Cindy and the Estate of Chet Huffman are liable for an addition to tax under section 6651(a)(1) for 2009; (7) Dukes is liable for tax on an increase to capital gain net income for 2009; (8) Dukes is liable for additions to tax pursuant to section 6651(a)(1) for 2008–10; and (9) Dukes is liable for accuracy-related penalties pursuant to section 6662 for 2008–10.

When the Petitions were timely filed in these cases, all petitioners resided in California including Dukes, which maintained its principal place of business in California. These cases were consolidated for purposes of trial, briefing, and opinion pursuant to Rule 141(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulation of Facts, the Supplemental Stipulation of Facts, and the attached Exhibits are incorporated herein by this reference.

I.  *Background of Dukes and the Huffman Family*

Dukes was incorporated in 1958 and headquartered in Northridge, California. It manufactured and supplied various engineering components to the aerospace industry. Lloyd and Patricia both worked for Dukes; he initially as a design engineer and she as a bookkeeper.

In 1970 Lloyd was made president of Dukes and acquired 113,365 shares in the company. During Lloyd's time as president Dukes employed two of Lloyd and Patricia's sons: Randy and Lance (Randy and Lance) Huffman.

In January 1979 Lloyd and Patricia formed the Huffman Family Trust (Trust). They appointed themselves trustees of the Trust. Lloyd had his 113,365 shares in Dukes reissued to the Trust. The Trust acquired an additional 5,000 shares in 1990.

Lloyd held the position of Dukes president until 1987. He stepped down from the role after suffering a near fatal car racing accident. Within days of the accident, Lloyd and Patricia's other son, Chet, was

[*5] made chief executive officer (CEO) and issued 5,000 shares of Dukes (representing 0.7% of the total outstanding shares).

In March 1990 Lloyd and majority shareholder Robert L. Barneson[8] entered into an agreement (Lloyd-Barneson agreement) whereby Lloyd was granted the right to purchase Mr. Barneson's shares. At that time, Mr. Barneson owned 322,241 shares (representing 43% of the total outstanding shares). The Lloyd-Barneson agreement entitled Lloyd to purchase Mr. Barneson's shares upon Mr. Barneson's death or by a right of first refusal for a price not to exceed $2 per share. There was no specific termination or exercise date for purchasing the shares in the agreement.

In June 1993 Lloyd assigned his rights under the Lloyd-Barneson agreement to Chet (Assignment agreement). In August 1993 Chet exercised his assignee rights under the Lloyd-Barneson agreement. By separate agreement (Chet-Barneson agreement), he agreed to pay Mr. Barneson $150,000 for his 322,241 shares with $50,000 being paid upon execution and the remaining $100,000 being paid in equal installments over the following five years. As a result of the purchase, Chet became the majority shareholder of Dukes with 43.7% of the total outstanding shares.

In November 1993 Chet entered into two additional right to purchase agreements (RTP agreements)—one with Dukes Research and Manufacturing, Inc. (DRM), and another with the Trust. DRM was an S corporation owned entirely by Patricia; it owned 304,124 Dukes shares (representing 40.5% of the total number outstanding). The Trust owned 118,635 Dukes shares (representing 15.8% of the total number outstanding).

For a sum of $2 and "other good and valuable consideration," the RTP agreements provided Chet with the right to purchase DRM's and the Trust's Dukes shares for a price not to exceed $3.6 million and $1.4 million, respectively, upon the death of Lloyd and Patricia. Chet could also purchase the shares by virtue of a right of first refusal. The right of first refusal exempted offers from Randy and Lance, Chet's brothers. The parties executed an addendum to the RTP agreements that provided Chet with the option to purchase the shares at any time, in addition to the stated events in the agreements themselves.

---

[8] By January 1971 Mr. Barneson became the majority shareholder of Dukes.

**[*6]**    Chet was not permitted to sell, assign, or otherwise transfer his rights under the RTP agreements without the consent of the owners. For the RTP agreement between Chet and DRM, Chet had to obtain DRM's consent to override the alienability restrictions. For the RTP agreement between Chet and the Trust, Chet had to obtain Lloyd and Patricia's consent to override the alienability restrictions.

The RTP agreements provided that they were "not compensatory in nature, rather the purpose [was] to retain the ownership of" Dukes within the family. A tax opinion letter Chet obtained from the law firm Proskauer Rose LLP (Proskauer) stated that the purpose behind the RTP agreements "was not compensatory. It was not in connection with the performance of services."

## II.    *Dukes Under Chet's Leadership*

Chet graduated from Pepperdine University in 1983 with a bachelor's degree in business management. He worked abroad after college for approximately 14 months before returning stateside to work in the off-road racing industry. After his father's accident, he assumed the role of Dukes's CEO, at which time the company had annual revenue of approximately $5 million. From 1993 to 2006 Chet's salary ranged from $65,000 to $85,000. In 2007 it increased to $147,000; at this time the salary of Dukes's only other paid officer was $243,300.

Under Chet's leadership Dukes expanded its product offerings and implemented a new strategy for acquiring and maintaining customers. When Chet started at Dukes, the company mainly produced in-line boost pumps for piston aircrafts. In the early 1990s it began to supply bleed air valves and landed a key contract with the U.S. Air Force. This new product line enabled Dukes to build relationships with manufacturers Hawker Beechcraft and Cessna. In the late 1990s Dukes expanded into cabin pressure control systems.

Chet also altered Dukes's strategy for obtaining new business. In the aerospace parts manufacturing industry, there is a division of how parts are incorporated within an aircraft, both in its original design and in its maintenance and repairs. The original equipment manufacturer (OEM) is the parts supplier to the aircraft manufacturer. To become an OEM, an aircraft parts supplier will solicit parts specification requests from aircraft manufacturers. These are parts that will be incorporated into the aircraft's final design. The parts supplier will then design a part and bid it to the aircraft manufacturer. If the aircraft manufacturer

[*7] accepts the bid, it will then subject the part to testing, and upon passing the tests, the part will be incorporated into the aircraft.

There is also an aftermarket process by which aircraft parts suppliers may generate business. It involves selling the products to the purchasers of the aircrafts. The Federal Aviation Administration (FAA) has a separate process for this known as Parts & Manufacturing Approval (PMA). In this alternative process the aircraft parts manufacturer would design a product, seek certification of the part by the FAA, and then sell it directly in the aftermarket. The benefit of selling via the PMA process was higher profit margins. The aircraft manufacturer typically purchases parts from the OEM at much lower prices than it will the spare or replacement parts. Chet used the PMA process to expand Dukes customer base as well as enhance its profitability.

In addition to expanding the company's product line and altering its strategy for acquiring new business, Chet networked extensively and strived to acquire and maintain a strong workforce. By expanding into the bleed air valve industry, Chet was able to become personally acquainted with Hawker Beechcraft's president. Through that relationship Chet became a member of the General Aviation Manufacturers Association (GAMA), a lobbying organization for private aircraft. Most other GAMA members were industry leaders: presidents and other corporate executives of major aerospace companies. This allowed Chet to meet and develop personal relationships with customers and competitors alike.

Chet expanded and maintained Dukes's human capital as well. When he began with Dukes in the late 1980s, Dukes had approximately five engineering employees, one of whom was a part-time sales representative. By 2007 he had expanded the engineering team to include 18 full-time employees. Despite a competitive hiring environment, Dukes was able to keep its employee turnover low. It did so by instituting a four-day work week and offering deferred compensation plans for engineering employees, among other incentives. Under Chet's leadership Dukes experienced significant growth, and by the end of fiscal year 2006 it had annual revenue of approximately $28.14 million.

Over the years, members of the Huffman family formed and acquired various business entities to support Dukes's operations. On June 25, 2001, Chet and Cindy formed CCC&B, LLC (CCC&B), as equal

[*8] 50% owners. They formed CCC&B as a holding company for various intellectual property assets, including several licensing agreements with Honeywell Intellectual Properties, Inc. (Honeywell). CCC&B entered into sublicensing agreements for the Honeywell licenses with Dukes and another affiliate, PMA Sales, Inc. (PMA Sales). PMA Sales—owned 60% by Chet Huffman and 40% by Robb Watts—acted as a distributor for Dukes and specialized in aftermarket sales.

On January 1, 2005, CCC&B entered into an asset purchase and sale agreement with GST Industries, Inc., a California corporation that manufactured and assembled hydraulic and electro-mechanical components for the U.S. military. CCC&B then organized a new Arizona corporation, also named GST Industries, Inc. (GST), and transferred all of the acquired tangible operating assets to that entity.

Members of the Huffman family formed various business entities to lease employees and manufacturing equipment to Dukes. As of June 30, 2008, there were three leasing companies: (1) Aviation Manufacturing & Design Corp. (AMDC); (2) DRM; and (3) TRD of California, Inc. (TRD). Dukes was the only customer of each of the three leasing companies. The ownership of the leasing companies is set forth below:

| Entity | Chet | Lloyd | Patricia | Randy |
|--------|------|-------|----------|-------|
| AMDC | 57% | 43% | – | – |
| DRM | – | – | 100% | – |
| TRD | 66% | – | – | 34% |

III.    *Hanwha's Proposed Acquisition of Dukes*

In the early 2000s Chet began receiving correspondence from parties interested in acquiring Dukes. He rejected the offers because the company was not for sale. This changed in 2007 when Deloitte Corporate Finance, LLC (Deloitte), contacted Chet regarding a potential acquisition by its client, Hanwha Corp. (Hanwha), a Korean company.

In September 2007 Dukes and Hanwha entered into a nonbinding memorandum of understanding (MOU), which provided the terms of a tentative stock acquisition for a purchase price between $85 million and

[*9] $105 million, depending on the due diligence findings. The MOU also contemplated a reorganization before any sale. The following Dukes-affiliated entities would transfer their assets to Dukes: (1) CCC&B; (2) DRM; (3) TRD; and (4) AMDC. Chet would then form the Dukes Group, LLC (Dukes Group), and transfer all of the Dukes shares to the new entity. Chet would also transfer all GST shares to Dukes Group. The result would be that Dukes Group would be the sole shareholder of Dukes and GST with Chet as the sole member of Dukes Group.

On October 15, 2007, Chet exercised his rights under the RTP agreements, purchasing all of the Trust's and DRM's Dukes shares for $1.4 million and $3.6 million, respectively. This equates to $11.83 per share. He paid for the shares with a promissory note secured by the shares. At this point he owned 100% of the outstanding stock of Dukes. On June 23, 2008, Chet formed Dukes Group under Nevada law, electing to treat it as a disregarded entity. He was the managing member and 100% owner. On June 30, 2008, he transferred all of the stock of Dukes and GST to Dukes Group.

As part of the proposed consolidation, Chet caused AMDC, TRD, DRM, and CCC&B to each enter into asset purchase agreements with Dukes. These agreements were effective as of June 30, 2008.

The AMDC Agreement provided that Dukes would pay AMDC $39,929; the parties would void an employee leasing agreement; and AMDC would forgive a $148,508 debt owed by Dukes. The TRD agreement provided that Dukes would pay TRD $41,404; the parties would void an employee leasing agreement and an equipment leasing agreement; and TRD would forgive a $42,123 debt owed by Dukes. The DRM agreement provided that Dukes would pay DRM $85,155; the parties would void an employee leasing agreement; DRM would forgive a $465,000 debt owed by Dukes; and Dukes would assume three third-party contracts. The CCC&B agreement (CCC&B-Dukes agreement) provided that Dukes would forgive a $904,221 debt owed by CCC&B; the parties would void a licensing agreement between Dukes and CCC&B; and Dukes would assume three third-party contracts.

On February 23, 2009, Hanwha sent a letter to Chet stating that it no longer wished to acquire Dukes. The letter informed him that after considering economic conditions and reviewing Dukes's 2007 and 2008 financial statements, Hanwha had concluded that an acquisition would not be in Hanwha's best interest.

[*10] After the failed acquisition, Chet caused CCC&B and Dukes to enter into a modification of the CCC&B-Dukes agreement (Additional License Modification or ALM). The ALM was effective as of June 30, 2008. It provided that the original asset purchase agreement between Dukes and CCC&B would be extended to the date of any eventual sale to a third party. It also provided that the consideration for a future sale of Dukes would include any additional Honeywell licenses acquired by CCC&B and that they would be sold for their fair market value at the time of sale. The ALM also stated that CCC&B would be the direct payee for any portion of the purchase price attributable to the Honeywell licenses and any associated goodwill.

Chet caused CCC&B to enter a second modification (Correcting Amendment) of the CCC&B-Dukes agreement. The Correcting Amendment was dated March 1, 2011, with an effective date of June 30, 2008. In addition to the consideration stated in the CCC&B-Dukes agreement, the Correcting Amendment provided that Dukes would pay CCC&B the fair market value of its assets as of the closing date.

IV.    *TransDigm's Acquisition of Dukes*

After Hanwha decided not to acquire Dukes and its affiliates, Chet continued to pursue a sale of Dukes. On March 25, 2009, he entered into an agreement on behalf of Dukes with Deloitte to provide corporate finance advisory services. This agreement provided that Deloitte would assist Dukes in developing a brochure—the Confidential Information Memorandum (CIM)—to describe the company, as well as assist Dukes in marketing the business, selecting a buyer, and performing due diligence. Deloitte ultimately distributed the CIM to approximately 40 potential buyers. Dukes chose to pursue negotiation with TransDigm.

On September 2, 2009, TransDigm sent a letter of intent to Dukes, which was approved the same day by Chet as the sole director of Dukes. On December 1, 2009, Dukes and TransDigm entered into an asset purchase agreement (Dukes-TransDigm agreement). The agreement provided for a $95.75 million purchase price, all of which would be wired to the sellers at closing, save for $10.5 million which would be held in escrow for 24 months. In addition to the base purchase price, the agreement provided Dukes with an earn-out of up to $60 million. The assets acquired by TransDigm were transferred to a newly formed subsidiary of TransDigm, Dukes Aerospace, Inc. (Dukes Aerospace).

[*11] The assets sold as part of the Dukes-TransDigm agreement included goodwill, which the agreement defined as "[a]ll goodwill associated with the Business, including any personal goodwill of Chet Huffman . . . as it relates to the Purchased Assets and the Business." TransDigm was also required to engage the investment bank and advisory firm Stout Risius Ross, Inc. (SRR), to prepare a valuation of the purchased assets and allocate the purchase price among those assets.

Dukes was then required to engage an independent valuation expert, other than Deloitte, to perform an additional valuation to determine what portion of the purchase price allocated to goodwill (by SRR) should be considered Chet's personal goodwill versus the company's enterprise goodwill. The final allocation of the purchase price was to be binding on the parties.

In accordance with the Dukes-TransDigm agreement, TransDigm engaged SRR to perform the asset valuation and purchase price allocation. SRR allocated $50.042 million to goodwill. Dukes engaged the consulting firm Duff & Phelps, LLC (Duff & Phelps), to perform the additional valuation and the allocation of the purchase price among the goodwill subcategories. TransDigm approved Duff & Phelps as the designated appraiser.

On June 10, 2010, Duff & Phelps rendered its valuation opinion, finding that Chet's personal goodwill accounted for $21.8 million of the total $50.042 million (reached by SRR). Duff & Phelps determined that $17.4 million was attributable to Chet's relationships with clients and $4.4 million was attributable to his relationships with Dukes's key employees. Shortly before trial, Duff & Phelps revised its valuation of Chet's personal goodwill to $19.2 million to account for an 18-month expected lag time in Chet's ability to compete.

As part of the Dukes-TransDigm agreement, Chet entered into a noncompete agreement with Dukes Aerospace and TransDigm. The term of the agreement was four years. The Dukes-TransDigm agreement also required that PMA Sales execute an agreement relinquishing its rights to the Honeywell licenses that it entered into in 2001 and 2003. Pursuant to this agreement, PMA Sales agreed not to seek parts manufacturer approval from the FAA for four years. Finally, the Dukes-TransDigm agreement provided that the transaction and the legal relations between the parties would be governed by the laws of the State of California.

[*12] In April 2010 Chet stopped working at the Dukes Aerospace facility.[9] On August 23, 2011, Chet, Dukes, GST, and Dukes Group filed a complaint against TransDigm and Dukes Aerospace in the Los Angeles County Superior Court, asserting claims for contractual fraud relating to the Dukes-TransDigm agreement. The parties to that suit eventually settled the matter, agreeing to extend the term of Chet's noncompetition agreement to nine years and requiring him to sell his interest in PMA Sales, among other terms.

## V.     *Preparation of Tax Returns*

Beginning in the early 1990s, Dukes and the Huffman family engaged A.R. Beckman and his son Ron Beckman (Mr. Beckman) to prepare the company's and the family's tax returns. After A.R. Beckman passed away, Mr. Beckman took over the practice, employing another certified public accountant (CPA), Tammy Ross-Stearn. Chet hired Mr. Beckman as chief financial officer of Dukes in 2004. Ms. Ross-Stearn took over Mr. Beckman's accounting practice and the responsibility of filing returns on behalf of the Huffman family, Dukes, and all Dukes affiliates.

Ms. Ross-Stearn continued to provide accounting and tax advisory services to the family and Dukes until August 28, 2009, when she terminated the relationship by letter. The termination letter indicated that Dukes should immediately retain a new accounting firm since the 2007 and 2008 returns were coming due. At the same time the IRS was conducting an audit of Dukes's 2006 Form 1120, U.S. Corporation Income Tax Return.

In November 2009 Mr. Beckman contacted a new CPA, Craig Whitfield, about being retained as accountant for the Huffman family and Dukes. Mr. Whitfield was formally engaged on January 4, 2010. His first task was obtaining his new clients' books and records for the year under audit, the delinquent tax returns, and those coming due. He reached out to Ms. Ross-Stearn for this information; she indicated that all the records had been sent to Dukes's Northridge, California, facility after TransDigm's acquisition.

Mr. Whitfield thereafter directed his requests to TransDigm's corporate controller, Sean Maroney. After speaking with Mr. Maroney

---

[9] At a February 3, 2012, meeting of the board of directors of Dukes Aerospace, Chet's employment with Dukes Aerospace was terminated, effective immediately.

[*13] in January 2010, TransDigm compiled the documents and shipped some 40 boxes to Mr. Whitfield. The boxes began arriving at the end of March and early April 2010. The financial statements were unorganized and incomplete.

On May 14, 2010, Mr. Whitfield sent Ms. Ross-Stearn a formal Circular 230 demand letter, requesting access to Dukes's client records for the fiscal year ending June 30, 2007 (the return for this year was then under audit). This led to a meeting with Ms. Ross-Stearn on June 1, 2010, wherein she provided the trial balance and general ledger of Dukes for the year ending June 30, 2007. Ms. Ross-Stearn asserted that all other documents were in TransDigm's possession.

After speaking with Ms. Ross-Stearn, Mr. Whitfield reached out to BDO Seidman, LLP, and obtained the financial statements it had prepared on behalf of Dukes for fiscal years ending 2007–09. Mr. Whitfield shared these documents with the IRS revenue agent in charge of the audit investigation. He also used the documents to begin filing returns on behalf of Dukes, the Dukes affiliates, and the Huffman family. Mr. Whitfield engaged another CPA, Mark Hutchinson (a partner at the accounting firm Rothstein Kass), to assist in the filing of the returns. Mr. Hutchinson also tried to reach Ms. Ross-Stearn, but she did not return his calls.

Mr. Hutchinson filed Chet and Cindy's 2008 and 2009 Forms 1040, U.S. Individual Income Tax Return, on January 31 and March 8, 2011, respectively. He filed CCC&B's 2009 Form 1065, U.S. Return of Partnership Income, in March 2011; on that return he reported approximately $12.692 million in gain from the sale of CCC&B's intellectual property assets. As the members of CCC&B, Chet and Cindy reported the intellectual property sale proceeds as section 1231 gain on their 2009 Form 1040.

Mr. Hutchinson filed Dukes's 2008–10 Forms 1120 on June 22, September 7, and November 22, 2011, respectively. Mr. Hutchinson filed separately Patricia and Lloyd's gift tax returns for 2007 on December 27, 2010.

On October 31, 2014, the IRS issued Letters 950-Z (30-day letter) to Chet and Cindy, as well as to Dukes. The letters stated that they had 30 days to review the proposed adjustments and seek a review from the

**[\*14]** IRS Office of Appeals;[10] otherwise a notice of deficiency would be forthcoming.  IRS Team Manager Bryant Stanik signed each 30-day letter; he was the immediate supervisor of the individual who made the initial penalty determinations that were reflected in each letter.  Chet and Cindy, as well as Dukes, did not reach a resolution of their cases at Appeals.  On November 12, 2015, the IRS issued notices of deficiency.[11]

## OPINION

There are two primary issues in these cases: (1) whether Patricia and the Estate of Lloyd Huffman made a taxable gift when Chet exercised his rights in the RTP Agreements in 2007, buying DRM's and the Trust's shares in Dukes for $5 million; and (2) whether Cindy and the Estate of Chet Huffman, as well as Dukes, properly reported the gain from the sale proceeds of the TransDigm acquisition in 2009 related to Chet's personal goodwill and CCC&B's intellectual property assets.  The ancillary issue is whether petitioners are liable for certain accuracy-related penalties and additions to tax.

I.    *Burden of Proof Generally*

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and taxpayers bear the burden of showing the determinations are erroneous.  Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).  Section 7491(a) provides an exception that shifts the burden of proof to the Commissioner as to any factual issue relevant to the taxpayer's tax liability if the taxpayer introduces credible evidence with respect to the issue and meets certain other conditions.  *See* § 7491(a)(2).

Petitioners argue that respondent bears the burden of proof on all issues because respondent asserted valuations at trial that differed from those in the notices of deficiency.  In the notices of deficiency the IRS valued DRM's and the Trust's shares in Dukes as of October 15, 2007,

---

[10] On July 1, 2019, the IRS Office of Appeals was renamed the IRS Independent Office of Appeals.  *See* Taxpayer First Act, Pub. L. No. 116-25, § 1001, 133 Stat. 981, 983 (2019).  We will use the name in effect at the times relevant to these cases, i.e., the Office of Appeals or Appeals.

[11] Patricia was issued two notices of deficiency.  One indicated her joint liability—with Lloyd—for the gift tax and additions to tax associated with the Trust's shares.  Lloyd received an identical deficiency notice for the liability associated with the Trust's shares.  The second notice of deficiency that Patricia received indicated her sole liability for the gift tax and additions to tax associated with DRM's shares.

[*15] at $23.9 million and $9.3 million, respectively. The IRS valued Chet's personal goodwill at zero. At trial respondent's expert testified that DRM's and the Trust's shares were worth $22.5 million and $8.8 million, respectively. Respondent's expert testified that Chet's personal goodwill was worth $3.9 million.

Petitioners argue that *Estate of Simplot v. Commissioner*, 249 F.3d 1191, 1193 (9th Cir. 2001), *rev'g and remanding* 112 T.C. 130 (1999), and *Estate of Mitchell v. Commissioner*, 250 F.3d 696, 702 (9th Cir. 2001), *aff'g in part, vacating and remanding in part* T.C. Memo. 1997-461, prove their point. We agree in part.

In *Estate of Simplot v. Commissioner*, 249 F.3d at 1193, the Commissioner conceded that the assessed deficiency was erroneous, thus forfeiting the presumption of correctness. In *Estate of Mitchell v. Commissioner*, 250 F.3d at 702, the Commissioner concluded in the notice of deficiency that the stock at issue was worth $105 million; at trial, the Commissioner's expert valued the stock at $81 million. This represented a 19% deviation. The U.S. Court of Appeals for the Ninth Circuit determined that this change in value rendered the Commissioner's initial assessment "arbitrary and excessive," and therefore the Commissioner had the burden of proving whether a deficiency existed and if so the amount. *Id.*

Respondent has not conceded that the deficiency notice determinations were erroneous; therefore, *Estate of Simplot* is inapposite. Respondent did, however, alter his valuations. At trial respondent's expert valued DRM's and the Trust's shares at amounts that represent a 6% and a 5% change, respectively. We do not think this makes respondent's initial valuation arbitrary and excessive. These figures are still entitled to a presumption of correctness.

The IRS determined in the notices of deficiency that no amount should have been attributed to Chet's personal goodwill. In pretrial briefing, respondent offered the alternative position that Chet's personal goodwill should be valued at $3.9 million.

On the basis of the Ninth Circuit's analysis in *Estate of Mitchell*, we agree with petitioners that the IRS's initial determination as to the personal goodwill was arbitrary. *See id.* at 703. Respondent bears the burden of proof on the issue of valuing Chet's personal goodwill as it relates to the TransDigm acquisition of Dukes in 2009. All other determinations retain the presumption of correctness.

**[\*16]** II.    *Gift Tax Issue*

Respondent asserts that Patricia and the Estate of Lloyd Huffman are liable for gift tax arising from the sale of Dukes shares to Chet in 2007 when he exercised the options in the RTP agreements. To that point respondent argues that the RTP agreements are not controlling as to the fair market value of the shares, i.e., the shares were not in fact worth $5 million in 2007.

Respondent contends that the shares were worth approximately $31.3 million and so the differential value between the purchase price and the true fair market value should be deemed a gift. Petitioners maintain that the RTP Agreements were valid business arrangements and therefore should be conclusive as to the value of the Dukes shares. We agree with respondent that the RTP Agreements should be disregarded. We ascertain the proper value below.

A.    *Section 2703*

Section 2703(a)(1) provides that the value of any property must be determined without regard to "any option, agreement, or other right to acquire or use the property at a price less than the fair market value of the property (without regard to such option, agreement, or right)." Section 2703(b) provides an exception to section 2703(a) for any option, agreement, right, or restriction that meets all of the following requirements: (1) it is a bona fide business arrangement; (2) it is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth; and (3) its terms are comparable to similar arrangements entered into by persons in an arm's-length transaction.

If section 2703(b) requirements are satisfied, then the agreement may be respected for valuation purposes. *See Holman v. Commissioner*, 130 T.C. 170, 191 (2008), *aff'd*, 601 F.3d 763 (8th Cir. 2010). To meet the first requirement of section 2703(b), an "agreement must further some business purpose." *Estate of Amlie v. Commissioner*, T.C. Memo. 2006-76, slip op. at 33. Maintaining managerial control or family ownership satisfies section 2703(b)(1). *See Holman*, 130 T.C. at 194 ("[B]uy-sell agreements serve a legitimate purpose in maintaining control of a closely held business.").

For the second requirement of section 2703(b), we consider the totality of the facts and circumstances. *Estate of Morrissette v. Commissioner*, T.C. Memo. 2021-60, at \*100. Whether an agreement

**[\*17]** "constitutes a testamentary device depends *in part* on the fairness of the consideration received by the transferor when it executed the transaction." *Id.* (emphasis added) (citing *Estate of True v. Commissioner*, T.C. Memo. 2001-167, *aff'd*, 390 F.3d 1210 (10th Cir. 2004)).

The regulations provide guidance on the final requirement of section 2703(b):

> A right or restriction is treated as comparable to similar arrangements entered into by persons in an arm's length transaction if the right or restriction is one that could have been obtained in a fair bargain among unrelated parties in the same business dealing with each other at arm's length.

Treas. Reg. § 25.2703-1(b)(4)(i). "A right or restriction is considered a fair bargain among unrelated parties in the same business if it conforms with the general practice of unrelated parties under negotiated agreements in the same business." *Id.* This determination will generally entail consideration of the following factors: (1) the expected term of the agreement; (2) the current fair market value of the property; (3) the anticipated changes in value during the term of the arrangement; and (4) the adequacy of any consideration given in exchange for the rights granted. *Id.*

This Court has described the final prong of the section 2703(b) exception as "more of a safe harbor than an absolute requirement that multiple comparables be shown." *Estate of Morrisette*, T.C. Memo. 2021-60, at \*103 (quoting *Estate of Amlie*, T.C. Memo. 2006-76, slip op. at 41). It is therefore permissible to use an isolated comparable to establish that section 2703(b)(3) is satisfied. *Estate of Amlie*, T.C. Memo. 2006-76, slip op. at 41.

### B. *Analysis of the RTP Agreements*

On the basis of the interrelatedness of the parties to the RTP agreements, we review them with respect to section 2703 with a heightened level of scrutiny. *See Estate of True*, T.C. Memo. 2001-167, slip op. at 72 ("In evaluating whether buy-sell agreements were substitutes for testamentary dispositions, greater scrutiny was applied to intrafamily agreements restricting stock transfers in closely held businesses than to similar agreements between unrelated parties.").

**[\*18]** The parties agree that the first requirement of section 2703(b) is satisfied given that the stated purpose of the RTP agreements was to "retain ownership of the Dukes Shares within the Huffman Family." *See Holman*, 130 T.C. at 194. The parties disagree as to the other requirements, which we discuss below.

1. *Whether the RTP Agreements Were a Testamentary Device*

Respondent asserts that Chet paid less than adequate consideration when he entered into the RTP agreements. According to respondent's expert, Joseph Ruble of Caliber Advisers, Inc., the RTP agreements were together worth approximately $79,800 in 1993 when they were executed. Chet paid only the stated consideration of $2 for these rights.

Petitioners put forth two alternative arguments on the basis of their expert's valuation of the agreements. They first argue that the RTP agreements were worth only $2 each, and so Chet did in fact pay the full consideration. Petitioners' expert, Curtis Kimball of Willamette Management Associates, asserted in his report that $2 is the correct value "if Dukes simply continued to be operated by the Owners without any change in strategy or inputs from an incentivized Grantee."

Petitioners alternatively assert that the rights under the RTP agreements were worth $77,850 "if Dukes was operated by the Owners with changes in strategy and inputs from an incentivized Grantee." They argue that notwithstanding this higher valuation, Chet still paid full consideration, not in dollars up front but in reduced compensation from the time he became CEO until the time he sold the company. From 1993 to 2006, Chet's salary ranged from $65,000 to $85,000. In 2007 it increased to $147,000 but was far less than the only other paid officer's salary of $243,300. This, petitioners argue, led to Chet's forgoing approximately $3.5 million in compensation over the years.

Petitioners contend that the RTP agreements contemplated reduced compensation as a form of payment because each stated that the agreements were entered into for "Two Dollars ($2.00) *and for other good and valuable consideration*." They argue then that the "other good and valuable consideration" was the reduced compensation.

Respondent disagrees with petitioners that reduced compensation could have formed part of the consideration that Chet paid for the rights under the RTP agreements. Respondent points to the

**[*19]** text of the agreements, which each state that "this Agreement is not compensatory in nature, rather the purpose is to retain the ownership of" Dukes within the family. Respondent also notes that a tax opinion letter Chet obtained from Proskauer came to the same conclusion, noting that the purpose behind the RTP agreements "was not compensatory. It was not in connection with the performance of services."

We agree with respondent that the rights associated with the RTP agreements were worth substantially more than $2. This finding is supported by both parties' experts' valuations of the agreements. Still, we do not think that the RTP agreements were a testamentary device by which Lloyd and Patricia attempted to pass assets on to their son Chet. We make this determination on the basis of all of the facts and circumstances involved. *See Estate of Morrisette*, T.C. Memo. 2021-60, at *100.

If we viewed the exchange of $2 for the rights under the RTP agreements without considering the circumstances, we would agree that this was an inequitable exchange. While we take note that the agreements themselves purported not to be compensatory, Chet *did* accept a reduced salary during his years as Dukes's CEO. Given his significant contributions to the company, we think that his reduced salary should be deemed consideration for the RTP agreements.

We note the significant amount of earnings growth that would have had to occur for the options to become "in the money." According to respondent's expert, the Dukes shares were worth approximately $0.51 per share in 1993; petitioners' expert says they were worth approximately $0.47 per share. In 2007 Chet was able to purchase the shares for $11.83 per share. If we average the parties' per-share 1993 values ($0.49 per share), the Dukes shares that Chet purchased in 2007 had increased in value by 2,414%.

We view this level of growth as unusual and unexpected. It is supported by the 1993 transaction by which Chet purchased Mr. Barneson's shares for $150,000. Chet and Mr. Barneson—unrelated parties—reached this figure by estimating annual revenue growth for Dukes at 4% per year. Using a 4% growth rate, the shares that Chet was able to purchase via the RTP agreements would have taken between 50 and 70 years to reach an "in the money" value.

[*20] We also note that the RTP agreements—though negotiated among family members—did have the characteristics of an arm's-length transaction. Both parties were motivated to reach a fair price. Lloyd and Patricia were willing to part with their shares only for $5 million—an amount which they considered sufficient for their retirement. Chet on the other hand was incentivized to drive this number down so that he could reach the "in the money" value we mentioned above sooner. This incentivized Chet both to stay with the company and to increase its per-share value.

Taking these facts together, we do not think that the RTP agreements were a testamentary device by which Lloyd and Patricia transferred Dukes shares to Chet for less than full consideration. Section 2703(b)(2) is satisfied.

> 2. *Comparability of the RTP Agreements to Similar Arrangements*

Petitioners argue that the final section 2703(b) requirement is satisfied by the Lloyd-Barneson agreement, which they claim is comparable to the RTP agreements and was entered into in an arm's-length transaction. Petitioners note that the Lloyd-Barneson agreement contained the following provisions, which are also included in the RTP agreements: (1) a right to purchase on the death of the grantor and by a right of first refusal; (2) a maximum purchase price; and (3) no specific termination or exercise date. Petitioners also point out that the Lloyd-Barneson agreement was entered into by unrelated parties—Lloyd and Mr. Barneson—and executed at arm's length.

Respondent counters that the Lloyd-Barneson agreement cannot serve as a good comparable because it was not submitted into evidence. Respondent notes that there are only two pieces of evidence which describe the Lloyd-Barneson agreement: a one-paragraph reference in the Assignment agreement and another in the Chet-Barneson agreement. Otherwise, the only information provided about the Lloyd-Barneson agreement comes from witnesses' testimony, which made vague references to the agreement.

Respondent contends that even if we are to find that the testimony regarding the Lloyd-Barneson agreement is credible, there are differences among it and the RTP agreements which render the Lloyd-Barneson agreement not a good comparable. The noted differences are that (1) Lloyd Huffman was allowed to freely transfer his

[*21] rights whereas Chet had to obtain consent from the owners; (2) the right of first refusal in the RTP agreements exempted offers from Chet's brothers; (3) the RTP agreements had an addendum that granted Chet the right to purchase the shares at any time at his discretion; and (4) the stated purpose of the RTP agreements was to retain ownership of Dukes within the Huffman family.

We agree with respondent. As we noted in *Estate of Amlie*, T.C. Memo. 2006-76, slip op. at 41, reliance on an isolated comparable is adequate given that the regulations "delineate more of a safe harbor than an absolute requirement that multiple comparables be shown." Use of the Lloyd-Barneson agreement then would be acceptable to show that the RTP agreements had terms similar to an agreement entered into at arm's-length. But as respondent notes, we do not have the Lloyd-Barneson agreement in evidence. We have only vague and incomplete references to it and testimony based on those references. We do not have an isolated comparable to undergo the section 2703(b)(3) analysis.

Even if we were to accept witnesses' testimony as sufficient evidence, we do not think that the Lloyd-Barneson agreement is sufficiently similar. Even though the three agreements purport to create rights to purchase Dukes shares for a maximum price, the differences among them are significant. For example, Chet had the unfettered right to purchase the Dukes shares at any time and at his sole discretion; Lloyd did not have this same right. Further, Lloyd was permitted to assign or otherwise transfer his purchase rights whereas Chet had to obtain consent to do the same. Chet then had rights superior to Lloyd's in purchasing the shares but inferior in transferring those rights. The terms of the agreements are therefore not comparable within the meaning of section 2703(b)(3).

On the basis of the foregoing, we do not think that petitioners have satisfied the final requirement of section 2703(b). *See Estate of Blount v. Commissioner*, T.C. Memo. 2004-116, slip op. at 48 (finding that solely testimony without production of comparable agreements was insufficient to satisfy section 2703(b)(3)), *aff'd in part, rev'd in part and remanded*, 428 F.3d 1338 (11th Cir. 2005). Section 2703(b) is therefore not satisfied, and so the RTP agreements must be disregarded for purposes of valuing the Dukes shares that Chet purchased in 2007. *See* § 2703(a).

[*22]  C.    *Value of Dukes Shares in 2007*

Lloyd and Patricia indirectly owned shares in Dukes by virtue of their interests in the Trust and DRM.  While they had equal interests in the Trust's shares, only Patricia had an interest in DRM's shares.  On October 15, 2007, Chet exercised his rights under the RTP agreements, purchasing the Trust's and DRM's shares for $1.4 million and $3.6 million, respectively.  Respondent argues that the shares were worth more than the amount Chet paid, and therefore Lloyd and Patricia made taxable gifts when they caused the Trust and DRM to transfer their shares.

In the notice of deficiency issued to Lloyd (for his interest in the Trust), the IRS valued the Trust's 118,635 shares at $10.7 million.  Since Chet paid $1.4 million for the Trust's shares, the IRS determined that Lloyd made a $9.3 million gift to Chet.

In the first notice of deficiency issued to Patricia (for her interest in the Trust), the IRS similarly valued the Trust's 118,635 shares at $10.7 million.[12]  Since Chet paid $1.4 million for the Trust's shares, the IRS determined that Patricia made a $9.3 million gift to Chet.  In the second notice of deficiency issued to Patricia (for her interest in DRM), the IRS valued DRM's 304,124 shares at $27.5 million.  Since Chet paid $3.6 million for the shares, the IRS determined that Patricia made a $23.9 million gift to Chet.

At trial respondent's expert concluded that the aggregate fair market value of Dukes shares as of October 15, 2007, should be $31.3 million: $22.5 million attributable to DRM's shares and $8.8 million attributable to the Trust's shares.[13]  Under this valuation, Patricia made a taxable gift of $18.9 million attributable to DRM's shares and together

---

[12] Patricia and Lloyd received identical notices of deficiency for their role as donors of the Trust's shares in Dukes.

[13] When Chet exercised his rights under the RTP agreement with the Trust, he purchased its shares for $1.4 million.  In the notices of deficiency issued to Patricia and Lloyd, the IRS determined that they were each liable for gift tax for that transaction because they had caused the Trust to transfer its shares to Chet for less than their fair market value.

When Chet exercised his rights under the RTP agreement with DRM, he purchased its shares for $3.6 million.  In the notice of deficiency issued to Patricia, the IRS determined that Patricia was liable for gift tax for that transaction because she had caused DRM to transfer its shares to Chet for less than their fair market value.

[*23] Patricia and Lloyd made a taxable gift of $7.4 million attributable to the Trust's shares.

Petitioners argue that the shares were worth in total $5 million—as provided in the RTP agreements—and therefore Patricia and Lloyd did not make a taxable gift on October 15, 2007. Alternatively, petitioners' expert submitted that the fair market value of the Trust's 118,645 shares was approximately $4.5 million while that of DRM's shares was approximately $11.6 million. Under that valuation, Patricia made a taxable gift of approximately $8 million attributable to DRM's shares and together Patricia and Lloyd made a taxable gift of approximately $3.1 million attributable to the Trust's shares. We consider the parties' expert reports and arguments below.

1. *Parties' Experts' Reports*

a. *Respondent's Valuation*

Mr. Ruble testified on behalf of respondent as an expert for the purpose of valuing the Dukes shares. Mr. Ruble used three valuation approaches to ascertain the fair market value of Dukes Group on a marketable, controlling interest basis: (1) income approach using a discounted cashflow (DCF) analysis; (2) market approach using a guideline company analysis; and (3) market approach using a business transaction analysis. Mr. Ruble determined the value of Dukes Group under each method, then took the weighted average of the three values to reach an enterprise value of $74.8 million.

To determine the fair market value of invested capital in Dukes Group, Mr. Ruble added to the enterprise value $5.3 million in noncore net assets and $1.8 million in net working capital. Taking these adjustments into account, Mr. Ruble reached a fair market value of invested capital for Dukes Group at $81.9 million as of the valuation date.

To determine the fair market value of the invested capital in Dukes, Mr. Ruble subtracted the fair market value of the Dukes-related affiliates' (DRM, AMDC, TRD, and CCC&B) assets from the Dukes Group invested capital value. He determined that the fair market value of the Dukes-related affiliates' assets (DRA) was $1.8 million. After subtracting the $1.8 million in DRA assets and $3 million in debt owed by Dukes, Mr. Ruble found that the fair market value of the invested capital in Dukes was $77 million as of the valuation date.

**[\*24]**  Lastly, Mr. Ruble took into account discounts for lack of control and lack of marketability.  He determined that the appropriate minority interest discount was 10%.  He determined that the appropriate marketability discount was 20%.  After considering the discounts, Mr. Ruble determined that the fair market value of Dukes shares on a privately held, minority-interest basis was $55.3 million, or $74 per share.  He found that the value of the Dukes stock transferred from Lloyd and Patricia to Chet in 2007 was $31.3 million: $22.5 million attributable to DRM's shares and $8.8 million attributable to the Trust's shares.

b.  *Petitioners' Valuation*

Petitioners' expert, Duff & Phelps, used the same three valuation methods as Mr. Ruble.  Duff & Phelps's report similarly weighted each of the three valuation approaches equally to reach an enterprise value of $25.9 million.  It then added various adjustments: (1) $2.6 million as the present value of the operating cashflows from CCC&B; (2) $4.4 million and $160,100 as the loan receivable from Chet and the amount due from PMA Sales, respectively; and (3) $2.5 million as the excess of working capital.  After these adjustments, Duff & Phelps determined that the enterprise value of Dukes was $35.6 million.

Duff & Phelps next determined a key person discount by valuing Chet's personal relationships with key clients and key employees.  It determined the value of Dukes attributable to Chet's personal relationships with key clients to be $3 million.  It determined the value of Dukes attributable to Chet's relationships with key employees to be $2.6 million.  Duff & Phelps then discounted the $2.6 million to $1.3 million to account for a 50% probability that the key employees would leave if Chet left.  Taking that together, Duff & Phelps reached a key person discount of $4.3 million or 16.7%.

After deducting the key person discount, Duff & Phelps reached a $31.3 million value for Dukes.  It then deducted the interest-bearing debt obligations of Dukes to reach a total fair market value of all equity in Dukes at $28.7 million.  It found this equated to $38.20 per share.  Duff & Phelps then valued the shares held by DRM and the Trust as of 2007 using this per-share value, reaching the final figure of $16.3 million as the aggregate value.

**[\*25]**      2.      *Parties' Arguments as to Value*

a.      *Respondent's Arguments*

Respondent first notes that Duff & Phelps did not use any information from the Hanwha MOU or the Deloitte CIM in its analysis. Respondent asserts that these should have been considered in the valuation determination because they represented actual market transactions, albeit proposed ones.

Respondent also notes that Duff & Phelps removed certain revenues from Dukes relating to the CCC&B licenses after three years. Duff & Phelps assumed that the sublicense agreement would not be renewed because the royalty paid was not market rate. Respondent contends that the royalty was within the market rate range in 2007 and therefore should not have been phased out in 2010. Mr. Ruble testified that there would have been an additional $10 million of value if Dukes had been able to continue using the licenses to sell Honeywell products.

Respondent asserts that Duff & Phelps calculated the key person discount improperly. Respondent contends that—instead of subtracting from the weighted average enterprise value—Duff & Phelps should have used only the income approach valuation figure as a starting point. Respondent further contends that Duff & Phelps should have compared the value of the business assuming that Chet left Dukes to the value of the business assuming that Chet stayed with Dukes pursuant to the income approach. According to respondent, Duff & Phelps attributes too high a value to other key employees. For these reasons, respondent argues that the total value of the key person discount should be reduced from $4.3 million to $1.75 million.

Additionally, respondent argues that Duff & Phelps used improper pricing multiples for the market approaches. Respondent asserts that Duff & Phelps selected companies that fell at or below the lowest quartile of industry performance. For the market transaction method, Duff & Phelps used multiples of 0.8×, 0.8×, 7.0×, and 7.0×, while the industry medians were 1.7×, 2.4×, 10.0×, and 8.2×, respectively. For the market comparable method, Duff & Phelps used multiples of 1.11×, 1.19×, 6.5×, and 8×, while the industry medians were 1.27×, 1.26×, 11.26×, and 9.87×. Myron Marcinkowski of Duff & Phelps testified that had he used pricing multiples closer to the median, the concluded value would have increased.

[*26] Respondent lastly notes that Mr. Ruble's valuation of Dukes ($81 million) was comparable to the offer made in the Hanwha MOU (between $85 and $105 million) and the TransDigm purchase price ($95 million). Since petitioners estimated the enterprise value of Dukes at $35.6 million, it is not close to the actual transactions that took place and therefore is unreliable.

b.      *Petitioners' Arguments*

Petitioners contend that the difference in enterprise values reached by the parties' experts is largely attributable to their EBITDA figures.[14]     Petitioners assert that Mr. Ruble's inflated EBITDA calculation resulted from his reduction of the cost of goods sold and operating expense figures for fiscal year 2007. Petitioners argue that Mr. Ruble's adjustments were based on the CIM, which they believe is unreliable since Deloitte did not independently verify the accuracy of the information forming the adjustments.

Petitioners similarly criticize Mr. Ruble's use of the Hanwha MOU, asserting that it was nonbinding and contingent and therefore cannot serve as the basis for a proper valuation. Petitioners also note that the MOU and Dukes-TransDigm agreement were completely different transactions. The former contemplated acquiring all Dukes and GST stock, CCC&B's intellectual property, and the workforce and assets of the affiliate companies. In contrast, the Dukes-TransDigm agreement was structured as an asset purchase.

Petitioners assert that Mr. Ruble erroneously included the revenues of GST. They contend this inflated the Dukes valuation by at least $2 million despite GST's having gross profit of less than $900,000 in 2007.

Additionally, petitioners argue that CCC&B would not have renewed its license with Dukes after 2010. They note that despite there being market-level royalties for 2007, Chet had control over the licenses. And if he left Dukes, he would have caused CCC&B to enter into sublicensing agreements with GST and PMA Sales instead of Dukes. Petitioners further stress that CCC&B would not have renewed the licenses because the royalties were projected to be below market for 2008, 2009, and 2010.

---

[14] EBITDA is an abbreviation for earnings before interest, taxes, depreciation, and amortization.

**[*27]** Petitioners lastly voiced concerns about Mr. Ruble's minority interest discount and marketability discount. They noted that once Dukes's EBITDA is adjusted to account for advertising expenses and the affiliate companies' shares of earnings, the discounts would bring Mr. Ruble's enterprise value below petitioners' value.

### 3. *Conclusions as to Value of Dukes Shares in 2007*

We find that petitioners failed to meet the burden of proof regarding why their expert's valuation is correct. We agree with respondent that Duff & Phelps miscalculated the key person discount. In its report Duff & Phelps calculated the operating value attributable to Chet by first calculating the enterprise value without Chet using a DCF method. Duff & Phelps then subtracted that figure from the enterprise value calculated using the weighted average of the three methods. As respondent notes, this creates an apples-to-oranges comparison whereby the formula will always yield at least $2.5 million of value attributable to Chet regardless of whether he competes with Dukes. We think the better approach, as respondent notes, would have been to use the DCF enterprise value as the starting point.

We also agree with respondent that Duff & Phelps undervalued the Dukes shares when using the market approaches. In conducting this analysis, it selected 19 comparable companies for which to compare multiples. For both the market transaction and the market comparable methods, Duff & Phelps selected multiples that were at or below the lowest quartile of guideline companies. Mr. Ruble selected median quartile gross profit and EBITDA multiples.

Mr. Ruble's valuation is proper except for one adjustment: We direct the parties to adjust the valuation by removing the revenues associated with the CCC&B licenses as done by Duff & Phelps.

We agree with petitioners that the licensing agreement between Dukes and CCC&B would not likely have been renewed after its expiration on July 30, 2010, because the licensing fees that Dukes paid to CCC&B were too low. Although they were consistent with the market rate in 2007, Duff & Phelps projected that they would be below market for 2008–10. We do not think that Chet would have allowed CCC&B to renew the licensing agreement if he could generate higher fees from a different licensee.

Even if the fees were projected to be at or above market rate beyond the expiration date, we do not think Chet would have allowed

[*28] CCC&B to renew the licensing agreement because he would no longer have an interest in the licensee after leaving Dukes. Since he controlled CCC&B, it is far more likely that he would have caused it to enter into a new licensing agreement with GST, another manufacturing company capable of using the licenses, which he owned entirely. We conclude petitioners properly reduced Dukes's revenue associated with the Honeywell licenses owned by CCC&B.

Where property is transferred for less than adequate and full consideration in money or money's worth, the amount by which the value of the property exceeds the value of the consideration is deemed a gift. § 2512(b). We direct the parties to make the above change to Mr. Ruble's valuation. Chet paid $5 million ($3.6 million for shares from DRM and $1.4 million for shares from the Trust); this amount should be deducted from the value and the remaining amount is subject to gift tax.

III.   *Income Tax Issues*

The next issue concerns the treatment of sale proceeds from the Dukes-TransDigm agreement. First, we consider whether Chet and Cindy, as well as Dukes, properly reported the portion of the sale proceeds attributable to the CCC&B intellectual property assets. Second, we consider whether they properly valued and reported the sale proceeds associated with Chet's personal goodwill. In each case Chet and Cindy reported the sale proceeds and income. Respondent contends that all of the income should have been reported by Dukes as capital gain net income and then by Chet and Cindy as ordinary dividend income.

A.   *Sale of CCC&B's Intellectual Property Assets*

1.   *Parties' Arguments*

Respondent argues that the gain from the sale of the CCC&B intellectual property assets (i.e., the Honeywell licenses) should have accrued to Dukes and thereafter as a constructive dividend to Chet and Cindy. Respondent asserts that petitioners misreported the gains on CCC&B's Form 1065 and on Chet and Cindy's Form 1040 for 2009.

Respondent asserts that Dukes Group was the proper party to report the gain because CCC&B sold the assets before the Dukes-TransDigm agreement was executed. Respondent contends that the CCC&B-Dukes agreement controlled the methodology of the asset transfer and that by the terms of that agreement, the only consideration

**[*29]** was Dukes's forgiveness of a $904,221 debt in addition to other nonmonetary considerations. Therefore, respondent argues, no portion of the approximately $12 million in gain should have been reported by CCC&B.

Petitioners disagree. Although they recognize the CCC&B-Dukes agreement, they assert that it was never fulfilled because the Hanwha deal fell through. On that point petitioners assert that the loan was never forgiven and CCC&B continued to own the Honeywell licenses until the TransDigm acquisition in December of 2009.

Petitioners argue that CCC&B properly reported the gain from the TransDigm acquisition because they modified the terms of the CCC&B-Dukes agreement. They allege that they did so twice. Chet testified that shortly after the Hanwha deal fell through, he executed the first amendment, the ALM. Petitioners argue that the ALM extended the effectiveness of the CCC&B-Dukes agreement to the date of an eventual sale to a third party (which turned out to be TransDigm) and increased the consideration to the fair market value of the Honeywell licenses then owned by CCC&B.

Petitioners additionally argue that the second amendment to the CCC&B-Dukes agreement, the Correcting Amendment, also increased the consideration to the fair market value of the licenses. Chet testified that he executed this second amendment having forgotten about executing the ALM.

Respondent argues that neither of the amendments should be treated as effective. As to the ALM, respondent notes that it is not dated and therefore cannot be relied upon as having been executed before the TransDigm acquisition. Since it was not executed before the TransDigm acquisition, respondent argues, the CCC&B-Dukes agreement controlled. This would mean that only debt forgiveness was the consideration for the Honeywell licenses and therefore nothing further should have been reported by CCC&B or Chet and Cindy.

As for the Correcting Amendment, respondent argues that—in contrast to the ALM—it did not (1) extend the effectiveness of the CCC&B-Dukes agreement, (2) include additional Honeywell licenses acquired in 2009, or (3) require that CCC&B be the direct payee of the sales portions attributable to the Honeywell licenses.

**[\*30]**    2.    *Discussion*

The first principle of income taxation is that tax must be imposed on income to the party that earned it. *Commissioner v. Culbertson*, 337 U.S. 733, 739–40 (1949). As we have further concluded, "[t]he choice of the proper taxpayer revolves around the question of which person or entity in fact controls the earning of the income rather than the question of who ultimately receives the income." *Vercio v. Commissioner*, 73 T.C. 1246, 1253 (1980) (first citing *Am. Sav. Bank v. Commissioner*, 56 T.C. 828 (1971); and then citing *Wesenberg v. Commissioner*, 69 T.C. 1005 (1978)).

We agree with respondent that CCC&B did not directly sell the intellectual property assets to TransDigm in the 2009 acquisition. CCC&B was not a named party to the Dukes-TransDigm agreement, nor was it to be specifically allocated any of the purchase price. We, however, conclude petitioners properly reported the gain.

The facts indicate that the parties did not follow through with the CCC&B-Dukes agreement in 2008 as contemplated. The Honeywell licenses were still listed on CCC&B's 2008 Form 1065 at yearend and so too was the loan payable owing to Dukes. The terms of the CCC&B-Dukes agreement then were not carried out as anticipated, and CCC&B still owned the intellectual property assets going into 2009.

We believe that the ALM was duly executed in February or March of 2009 as Chet testified. Although the document is not dated, we acknowledge Chet's strategy in keeping the CCC&B intellectual property held separately. Chet testified that he had modeled this strategy after Honeywell, which kept its intellectual property assets in an entity separate from the operating business entity.

We agree that the timing of the ALM gives its alleged execution date credibility. Once the Hanwha deal fell through, Chet testified that he began more aggressively marketing Dukes for sale, hence the CIM sales brochure generated by Deloitte. This makes it more plausible that Chet would have sought to extend the effectiveness of the CCC&B-Dukes agreement until the date of an eventual sale.

Finally, we think that extending the effectiveness of the CCC&B-Dukes agreement—especially in early 2009—would have been advantageous to any eventual purchaser given that Hanwha had wanted to buy the Dukes organization (and its affiliates) as a whole.

[*31] Creating a mechanism then by which all assets would eventually come under the same corporate umbrella is plausible.

All of these facts lead us to the conclusion that petitioners have satisfied their burden of proof as to the CCC&B asset sale. We agree that the ALM amended the CCC&B-Dukes agreement, increasing the stated consideration to the fair market value of the then-owned Honeywell licenses and any other intellectual property held by CCC&B. On that basis, we agree with petitioners that CCC&B—and not Dukes— was the proper party to report the gain from the sale. Cindy and the Estate of Chet Huffman are not liable for dividend income related to the CCC&B intellectual property assets.

B.      *Sale of Chet's Personal Goodwill*

1.      *Parties' Arguments*

The next issue is the treatment of the TransDigm acquisition sale proceeds that petitioners allocated to Chet's personal goodwill. On their 2009 Form 6252, Installment Sale Income, Chet and Cindy reported approximately $21.8 million as the sale price attributable to Chet's personal goodwill. Of that amount, they reported $19.4 million as installment sale income.

Respondent argues that no amount of the sale proceeds can be attributed to Chet's personal goodwill, so it was improper for Chet and Cindy to report the income. Respondent argues that Nevada law applies because Dukes Group was a Nevada limited liability company. Respondent notes that under Nevada law, any property owned by a limited liability company must be held and owned in the name of the company. *See* Nev. Rev. Stat. § 86.281 (2010).

Respondent asserts that Chet was not a party to the Dukes-TransDigm agreement. Since he was not listed in the agreement, respondent asserts that the personal goodwill either was not properly transferred to TransDigm via the Dukes-TransDigm agreement or was already owned by Dukes Group before the sale. In either case, respondent argues that the income should have been reported instead by Dukes.

Petitioners argue that they properly reported the income according to the terms of the Dukes-TransDigm agreement. Section 2.01 of the agreement describes the purchased assets, which include goodwill. Goodwill is defined to include "[a]ll goodwill associated with

[*32] the Business, including any personal goodwill of Chet, the sole member of Dukes Group, as it relates to the Purchased Assets and the Business." Section 2.07 requires that the parties engage SRR to allocate the purchase price among the purchased assets.

Section 2.07 further provides that the sellers (i.e., Dukes) would hire an independent valuation expert, other than Deloitte, to prepare an allocation of the goodwill between enterprise goodwill and the personal goodwill of Chet. If TransDigm disagreed with the suballocation, then it could hire a different valuation firm to provide the analysis. Otherwise, the decision reached by the appraiser was to be binding on the parties. Section 2.07 finally provides that "[t]he Sellers will allocate the Adjusted Purchase Price between them and Chet Huffman with respect to the personal goodwill, if any, as they agree and in a manner consistent with this Section."

Petitioners assert that the parties followed these provisions to the letter. SRR valued the purchased assets including the goodwill, to which it ascribed a value of approximately $50 million. Dukes then hired Duff & Phelps to perform the suballocation among the personal and enterprise goodwill components. At trial Chet testified that TransDigm agreed to the engagement of Duff & Phelps. Duff & Phelps valued Chet's personal goodwill at $21.8 million. Petitioners argue that because the Dukes-TransDigm agreement specifically allocated this amount to Chet, it was his responsibility to report it.

Despite the valuation from Duff & Phelps, the IRS determined in the notice of deficiency that Chet's personal goodwill had no value. Respondent contends that the expert report from Duff & Phelps cannot be relied upon because Mr. Marcinkowski made errors. First, respondent notes that Mr. Marcinkowski changed his personal goodwill valuation before trial. He lowered the personal goodwill amount from $21.8 million to $19.2 million after changing his assumption regarding when Chet would be effective in competing against Dukes. He decided that it would instead take Chet 18 months to become competitive. Respondent argues that this deviation weighs against Mr. Marcinkowski's credibility as an expert.

Respondent also notes that Mr. Marcinkowski used a perpetuity model to determine the residual value of Chet's personal goodwill. Respondent contends that this was improper because Chet was 48 years old at the time of the TransDigm acquisition in 2009. If Chet retired within the next 20 years, the value of his personal goodwill would be

[*33] reduced to $15.5 million. Finally, respondent argues that there should have been no portion of Chet's personal goodwill which was attributable to other employees at Dukes. Respondent contends that this is problematic because these employees, like Chet, did not have an employment agreement in place.

As an alternative argument, respondent's expert, Mr. Ruble, asserted that Chet's personal goodwill did have some value, approximately $3.9 million worth. Mr. Ruble confined his report to the areas in which he assumed that Chet offered the most value to Dukes: generating new business, either to existing customers or to new customers. Mr. Ruble asserted that the existing customers were mostly focused on pricing, quality, and the ability to deliver products timely. Respondent relies upon Chet's testimony that the driving factors of growth for Dukes were a combination of acquisitions and winning new programs as well as choosing good products with high profit margins.

In his report, Mr. Ruble concluded that it was unlikely Dukes would have had fewer opportunities if Chet were no longer with the company. Mr. Ruble contended that Dukes would likely have hired a qualified replacement to mitigate the damages created by Chet's lack of engagement with the company. Dukes could have hired a replacement from either an industry competitor, TransDigm, existing Dukes management, or one of Dukes's customers.

2. *Discussion*

As discussed below, we find that Chet had personal goodwill and that he and Cindy properly reported the sale proceeds attributable to the goodwill to the extent of its fair market value.

Petitioners assert that Nevada law is irrelevant despite Dukes Group's being formed there. We agree. The Dukes-TransDigm agreement specifically provides that the transaction and the legal relations between the parties will be governed by the laws of the State of California. We apply California law then in determining whether goodwill can be separated from a business and attributed to an individual.

Goodwill has been defined as the expectation of continued patronage. *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555 (1993). It has also been defined as "the sum total of those imponderable qualities which attract the custom of a business—what brings patronage to the business." *Philip Morris Inc. & Consol. Subs.*

[*34] *v. Commissioner*, 96 T.C. 606, 634 (1991) (quoting *Boe v. Commissioner*, 307 F.2d 339, 343 (9th Cir. 1962), *aff'g* 35 T.C. 720 (1961)), *aff'd*, 970 F.2d 897 (2d Cir. 1992). Goodwill can generally take two forms: (1) personal goodwill owned by key employees or shareholders and (2) corporate or enterprise goodwill developed and owned by the company or employer. *Bross Trucking, Inc. v. Commissioner*, T.C. Memo. 2014-107, at *21. A business can only distribute corporate assets and cannot distribute assets personally owned by shareholders. *See Martin Ice Cream Co. v. Commissioner*, 110 T.C. 189, 209 (1998). Key employees may transfer their personal goodwill via employment contracts or noncompete agreements. *Bross Trucking, Inc.*, T.C. Memo. 2014-107, at *27 (citing *Martin Ice Cream Co.*, 110 T.C. at 207).

We agree with petitioners that Chet created personal goodwill through his relationships with key employees and customers during his time as Dukes's CEO. We also agree on the basis of the Dukes-TransDigm agreement that the parties to that transaction allocated a portion of the sale proceeds to Chet as his personal goodwill. Under California law, personal goodwill is an intangible asset capable of being owned by an individual. *See, e.g.*, *In re Marriage of Nichols*, 33 Cal. Rptr. 2d 13, 20 n.4 (Ct. App. 1994).

While working for Dukes Chet did not have an employment contract, nor was he subject to a noncompete agreement. For that reason we disagree with respondent that he somehow transferred his goodwill to Dukes before the acquisition. *See Bross Trucking, Inc.*, T.C. Memo. 2014-107, at *27. He continued to own his personal goodwill up until the TransDigm acquisition in December 2009; to that end, as part of the Dukes-TransDigm agreement, Chet entered into a noncompete agreement. Thus, any gain on the sale of that personal goodwill would have had to be reported by its owner, Chet. *See Commissioner v. Bollinger*, 485 U.S. 340, 344 ("For federal income tax purposes, gain or loss from the sale or use of property is attributable to the owner of the property."). On the basis of these findings, we conclude that respondent has failed to meet his burden of proof regarding Chet's personal goodwill.

Mr. Marcinkowski derived the personal goodwill value by performing a scenario analysis using the DCF method. He performed this same analysis for each component of the personal goodwill value: that attributable to Chet's personal relationships with key clients and that attributable to Chet's personal relationships with key employees.

**[\*35]** The first step he took for the key clients analysis was assessing the operating value of Dukes if TransDigm received full cooperation and assistance from Chet in perpetuity (Scenario 1). He discounted future cashflows from years 2010–14 to derive the Scenario 1 operating value of $87.084 million.

He then calculated the operating value of Dukes if TransDigm received no cooperation or assistance from Chet in perpetuity (Scenario 2). He similarly discounted future cashflows from years 2010 to 2014 to derive a range of potential values for Scenario 2: between $63.859 million and $75.471 million. The Scenario 2 range of values was calculated by estimating the percentage of revenue that would be lost if Chet did not cooperate with TransDigm after the acquisition.

His report indicated which clients would be vulnerable to Chet's influence. Revenue from most clients was expected to remain the same. Only revenue related to specific aircraft from Bombardier, Cessna, Cirrus Design, Hawker Beechcraft, and Lockheed Martin was expected to decline as a result of Chet's leaving. All other aircraft and clients were expected to generate the same level of revenue despite Chet's absence. Mr. Marcinkowski determined the percentage of revenue lost as follows for these clients:

| [*36] | *Percentage Revenue Retained After Chet's Leaving* | | |
|---|---|---|---|
| *Client* | *Aircraft* | *Low-End* | *High-End* |
| Bombardier | Challenger 604/605 | 75% | 50% |
| Bombardier | Challenger 850/850CD | 50% | 0% |
| Cessna | Citation Sovereign | 50% | 0% |
| Cessna | Citation X | 50% | 0% |
| Cirrus Design | SR22-G3 | 50% | 0% |
| Hawker Beechcraft | 450 | 55% | 10% |
| Hawker Beechcraft | Premier II | 70% | 40% |
| Lockheed Martin | F-16 | 50% | 0% |

These percentages were then multiplied by the unadjusted, projected revenues for each client to reach the adjusted revenues. The adjusted revenues formed the basis for calculating the future cashflows that would be discounted back to the present to reach an operating value. Once Mr. Marcinkowski had derived low- and high-end operating values for Scenario 2, he averaged the two figures and subtracted the averages from the Scenario 1 values to reach the values attributable to Chet's relationship with key clients. A similar analysis was done to reach the values attributable to Chet's relationships with key employees.

While we find Mr. Marcinkowski's methodology sound, we think that his report overestimated the percentage of revenue that would be lost as a result of Chet's failing to cooperate or assist TransDigm after the acquisition. We agree with Mr. Ruble that Chet would have had a much lesser impact on revenues from existing clients. His true value came from his ability to generate new business, be that from existing clients or new ones. Once the clients were obtained, keeping them was more a matter of continuing to provide quality products timely. This

[*37] was not an area that Chet himself had a direct influence on and should have been accounted for in Mr. Marcinkowski's analysis.

On that basis we conclude that instead of averaging the low- and high-end Scenario 2 values, it would be more appropriate to use the low-end value. We direct the parties to use the low-end operating value of $75.471 million as the Scenario 2 figure (from Exhibit 197, Exhibit C, p. 1) to reach the value attributable to Chet's relationship with key clients. The parties should additionally take into account the 18-month lag time that, Mr. Marcinkowski conceded at trial, Chet would need to become competitive with Dukes. We otherwise agree with Mr. Marcinkowski's valuation.

Our adjustments will lower the value attributable to Chet's personal goodwill. This means that the difference between the new value and that originally reported by Chet and Cindy should have been attributed to enterprise goodwill and reported by Dukes. Since this amount was distributed to Chet and Cindy, we agree with respondent that it must reclassified as a constructive dividend. *See Truesdell v. Commissioner*, 89 T.C. 1280, 1295 (1987) ("The crucial concept in a finding that there is a constructive dividend is that the corporation has conferred a benefit on the shareholder in order to distribute available earnings and profits without expectation of repayment.").

Cindy and the Estate of Chet Huffman had ordinary dividend income pursuant to section 301, which provides that a dividend is taxed as ordinary income only to the extent of the distributing corporation's earnings and profits. § 301(c); *Benson v. Commissioner*, T.C. Memo. 2004-272, slip op. at 43–44, *supplemented by* T.C. Memo. 2006-55, *aff'd*, 560 F.3d 1133 (9th Cir. 2009). Any excess is a nontaxable return of capital to the extent of the taxpayer's basis, and any remaining amount received is taxable as capital gain from the sale or exchange of a capital asset. *Benson*, T.C. Memo. 2004-272, slip op. at 44 (first citing § 301(c); then citing *Truesdell*, 89 T.C. at 1295–98; and then citing *Barnard v. Commissioner*, T.C. Memo. 2001-242).

Because a portion of the sale proceeds attributed to Chet's personal goodwill was actually enterprise goodwill, Dukes understated capital gain net income on its 2009 Form 1120. The amount by which Chet and Cindy overvalued Chet's personal goodwill should have been reported by Dukes with the rest of the sale proceeds on its 2009 Form 6252. Dukes is therefore liable for tax on an increase to capital gain net income for 2009.

**[\*38]** IV.   *Accuracy-Related Penalties and Additions to Tax*

We now address the ancillary issue of petitioners' liability for certain section 6662 accuracy-related penalties and section 6651 additions to tax.  The IRS determined accuracy-related penalties against Cindy and the Estate of Chet Huffman, as well as Dukes, and on the basis of our redeterminations in this Opinion with respect to those petitioners, together with the concessions previously noted, *see supra* note 7, there are grounds for section 6662 penalties.  For all petitioners, their failure to timely file certain returns and pay the amounts owing provides grounds for section 6651 additions to tax.

A.   *Burden of Proof*

Under section 7491(c), the Commissioner bears the burden of production with respect to the liability of an individual for any penalty or addition to tax.   The Commissioner satisfies that burden by presenting sufficient evidence to show that it is appropriate to impose the penalty in the absence of available defenses.  *Graev v. Commissioner*, 149 T.C. 485, 493 (2017) (citing *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001)), *supplementing and overruling in part* 147 T.C. 460 (2016).

This burden includes satisfying section 6751(b)(1), which provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher-level official as the Secretary may designate."  Section 6751(b) does not apply, however, to the addition to tax under section 6651.  *See* § 6751(b)(2)(A); *ATL & Sons Holdings, Inc. v. Commissioner*, 152 T.C. 138, 150 (2019).

In *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1071 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020), the Ninth Circuit considered the timeline for obtaining supervisory approval of "assessable penalties," which are not subject to deficiency procedures.  The Ninth Circuit held that, for an assessable penalty, supervisory approval is timely if secured before the penalty is assessed or "before the relevant supervisor loses discretion whether to approve the penalty assessment."  *Id.* at 1074.  More recently, in *Kraske v. Commissioner*, No. 27574-15, 161 T.C. (Oct. 26, 2023), a case (like the cases here) appealable to the Ninth Circuit (absent stipulation to the contrary), *see* § 7482(b), we addressed whether the holding in *Laidlaw's Harley Davidson* should be read so as to encompass penalties subject to

**[*39]** deficiency procedures as well. We held that it should, and pursuant to *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971), applied the holding to the facts of the case. *Kraske*, 161 T.C., slip op. at 7–8. We will afford precedential weight to, and follow, *Kraske* in the instant cases as it is squarely on point here.

For nonindividual taxpayers, the burden of production as to penalties remains with the taxpayer because section 7491(c) does not apply to corporations. *See NT, Inc. v. Commissioner*, 126 T.C. 191, 195 (2006). We held previously that the Commissioner does not have the burden of production as to supervisory approval under section 6751(b) for a penalty determined against a corporation in a notice of deficiency. *Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 231–32 (2018). Accordingly, respondent does not bear the burden of production for the penalties determined against Dukes.

Petitioners argue that respondent has not satisfied the burden of proof because the supervisory approval did not take a specific form. They note that the IRS supervisor did not sign a Civil Penalty Approval Form as encouraged by the Internal Revenue Manual. The supervisor instead signed the 30-day letter, which generally indicates the IRS's position on the disputed tax items and provides taxpayers a 30-day deadline to take their case to Appeals.

As we noted in *Palmolive Building Investors, LLC v. Commissioner*, 152 T.C. 75, 85–86 (2019), "[s]ection 6751(b) does not require written supervisory approval on any particular form." "[P]enalty approval [can] be found in 'a signed 30-day letter sent by the supervisor of the examining agent.'" *Castro v. Commissioner*, T.C. Memo. 2022-120, at *6 (quoting *Tribune Media. Co. v. Commissioner*, T.C. Memo. 2020-2, at *21). Since the IRS supervisor involved in these cases signed the 30-day letter, approval was properly obtained for the penalties in question, and respondent has satisfied his initial burden of proof under section 6751(b) as to the individual petitioners.

B.    *Section 6662 Penalties*

1.    *Liability*

Section 6662(a) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return if, as provided by section 6662(b)(1), the underpayment is attributable to "[n]egligence or disregard of rules or regulations." The penalty may also

[*40] be imposed for an underpayment attributable to any "substantial understatement of income tax." § 6662(b)(2).

For section 6662(b)(1) purposes, "negligence" includes "any failure to make a reasonable attempt to comply" with the internal revenue laws, and "disregard" includes "any careless, reckless, or intentional disregard." § 6662(c). Negligence also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Treas. Reg. § 1.6662-3(b)(1).

An understatement is substantial within the meaning of section 6662(b)(2) if it exceeds the greater of (1) 10% of the tax required to be shown on the return for the taxable year or (2) $5,000. § 6662(d)(1)(A). For corporations, there is a substantial understatement of income tax for any taxable year if the amount of the understatement exceeds the lesser of (1) 10% of the tax required to be shown on the return for the taxable year (or, if greater, $10,000) or (2) $10,000,000. § 6662(d)(1)(B). The accuracy-related penalty does not apply with respect to any portion of the underpayment for which the taxpayer shows that he or she had reasonable cause and acted in good faith. § 6664(c)(1); *see Higbee*, 116 T.C. at 448–49.

Respondent asserts that Cindy and the Estate of Chet Huffman, as well as Dukes, are liable for substantial understatement penalties under section 6662(b)(2), or alternatively, for negligence penalties under section 6662(b)(1). Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one ground. Treas. Reg. § 1.6662-2(c). As a result of our holdings herein and the parties' concessions in the cases involving Cindy and the Estate of Chet Huffman, as well as Dukes, the Rule 155 computations must confirm substantial understatements of income tax by those petitioners. Should the Rule 155 computations show substantial understatements of income tax (which we think they should), we conclude that respondent has met his burden of production for the accuracy-related penalties under section 6662(b)(2).[15]

---

[15] We note that respondent has in any event demonstrated that Chet and Cindy, as well as Dukes, acted negligently because the record before us shows that they failed to maintain books and records sufficient to accurately reflect their incomes. *See* Treas. Reg. § 1.6662-3(b)(1).

41

**[*41]** 2. *Reasonable Cause Defense*

Cindy and the Estate of Chet Huffman, as well as Dukes, assert that they had reasonable cause that negates any section 6662(a) penalties because their accountant, Ms. Ross-Stearn, terminated the business relationship on August 28, 2009. They claim that her hasty departure impeded their ability to timely submit accurate tax returns. They further claim that the delay was exacerbated by Ms. Ross-Stearn's and TransDigm's reluctance to provide financial statements that would form the basis of the tax returns for all of them.

Cindy and the Estate of Chet Huffman, as well as Dukes, claim that after Ms. Ross-Stearn disengaged, they employed two accountants to help them submit all the individuals' and Dukes-affiliated entities' income tax returns. They first hired Mr. Whitfield and later Mr. Hutchinson to expedite the process and determine how Dukes's sale proceeds should be reported.

They claim that they started first by considering the valuation provided by Duff & Phelps, which determined that $21.8 million of the sale proceeds were attributable to Chet's personal goodwill. They assert that they relied on the Duff & Phelps valuation as well as the Dukes-TransDigm agreement to allocate the $21.8 million entirely to Chet.

As for the proceeds attributable to the CCC&B intellectual property assets, Cindy and the Estate of Chet Huffman, as well as Dukes, assert that Mr. Whitfield independently determined that the intellectual property was held by CCC&B—and not Dukes. Mr. Whitfield also reviewed the licensing agreements and CCC&B's prior tax returns in reaching the conclusion that CCC&B was the proper entity to report the gain from the sale. Since Chet and Cindy were the sole owners of CCC&B, they contend that it was their responsibility to report the passthrough income from the sale.

Cindy and the Estate of Chet Huffman, as well as Dukes, claim that their reliance on the tax professionals excuses them from section 6662(a) penalties. The Court's caselaw sets forth the following three requirements for a taxpayer to use reliance on a tax professional to avoid liability for a section 6662(a) penalty: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's

[*42] judgment." *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

Chet and Cindy Huffman, as well as Dukes, relied on Mr. Whitfield and Mr. Hutchinson in determining how to report the sale proceeds from TransDigm's asset purchase. Both Mr. Whitfield and Mr. Hutchinson were licensed CPAs with significant experience in public and private tax accounting. Therefore, Chet and Cindy Huffman, as well as Dukes, were justified in relying on their advice.

At trial Chet testified that he provided complete access to the books and records of Dukes, the affiliated entities, and the individual family members. Chet also testified that he and Mr. Whitfield took great measures to obtain the tax documents of Dukes and the affiliated entities once Ms. Ross-Stearn disengaged. They successfully obtained approximately 40 boxes of financial data from Dukes and later were able to obtain the Dukes trial balance and general ledger from Ms. Ross-Stearn. On the basis of this testimony, as well as Mr. Hutchinson's testimony, we conclude that Chet and Cindy Huffman, as well as Dukes, provided the tax professionals with as much accurate information as they could assemble.

Finally, we believe that Chet and Cindy Huffman, as well as Dukes, relied in good faith on Mr. Whitfield's and Mr. Hutchinson's advice. Although Chet was a business school graduate and had successfully run Dukes for many years by the time of the TransDigm acquisition in 2009, he was not familiar with complex tax matters such as these. To ensure that he reported these items accurately, Chet hired two licensed accountants who rendered reasonable interpretations of the Code and the regulations. On that basis we find that Chet and Cindy Huffman, as well as Dukes, had reasonable cause with respect to the reporting of the Dukes-TransDigm sale proceeds, and thus they are not liable for the section 6662(a) penalties attributable to that underpayment. However, because they seemingly do not argue, and the record does not support in any event, that the reasonable-cause exception negates their liability for the section 6662(a) penalties attributable to the conceded adjustments, they are liable for such penalties to that extent.

43

**[\*43]**  C.  *Section 6651 Additions to Tax*

1.  *Liability*

Section 6651 imposes additions to tax for failure to file timely returns or failure to pay timely the amount shown as tax on any return. For failure to file timely returns, there shall be added to the amount required to be shown as tax 5% of such tax if the failure is for not more than one month.  § 6651(a)(1).  The penalty increases by 5% for each additional month the failure continues.  *Id.*

For a failure to pay timely, there shall be added to the amount shown as tax 0.5% if the failure is for not more than one month. § 6651(a)(2).  The penalty increases by 0.5% for each additional month the failure continues.  *Id.*  For failure either to file or pay timely, the addition to tax may not exceed 25% in the aggregate.  § 6651(a)(1) and (2).  There will be no additions to tax if the failure to file or pay was due to reasonable cause and not due to willful neglect.  *Id.*  The IRS determined section 6651 additions to tax against all petitioners.

Lloyd and Patricia—who were issued separate notices of deficiency for their varying interests in the Trust and DRM—did not report any taxable gifts for 2007.  The due date for the 2007 gift tax return was April 15, 2008.  Under our valuation, they should have reported a taxable gift to Chet.  Because Lloyd and Patricia did not timely file a gift tax return nor pay tax on the gift, respondent has met his burden of proof as to the additions to tax.  Patricia and the Estate of Lloyd Huffman must demonstrate that the failure to file/pay was due to reasonable cause and not due to willful neglect to avoid the additions.

Chet and Cindy's 2009 income tax return was due on October 15, 2010.  They did not file the return until March 8, 2011.  Because they filed the return late, respondent has met his burden of proving that they are liable for the additions to tax.  Cindy and the Estate of Chet Huffman must demonstrate that the failure was due to reasonable cause and not due to willful neglect to avoid the additions.

Dukes's 2008 return was due September 15, 2008.  Its 2009 return was due on September 15, 2009.  Its 2010 return was due on September 15, 2010.  Dukes filed its 2008–10 income tax returns on June 22, September 7, and November 22, 2011, respectively.  Because it filed the returns late, it is liable for the additions to tax unless it can show that the failures were due to reasonable cause and not due to willful neglect.

**[\*44]**       2.       *Reasonable Cause Defense*

All of the aforementioned income tax returns for Chet and Cindy, as well as Dukes, were filed late. Regardless of whether Ms. Ross-Stearn was employed during this time, they were responsible for timely submissions. *United States v. Boyle*, 469 U.S. 241, 252 (1985) ("The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not 'reasonable cause' for a late filing under § 6651(a)(1)."). Their argument that Ms. Ross-Stearn's departure gives them reasonable cause for the untimely filings is therefore unavailing. The section 6651(a)(1) additions to tax will be sustained as to Cindy and the Estate of Chet Huffman, as well as to Dukes.

Patricia and the Estate of Lloyd Huffman assert a different argument against imposition of the additions to tax under section 6651(a)(1) and (2). They claim that they were completely unaware of any gift tax liability. They believed that Chet paid the fair market value for the Dukes shares by exercising his rights under the RTP agreements in 2007. Their argument then is not that they failed to file so much as that they did not think a filing was required.

They claim that Ms. Ross-Stearn did not advise them of any potential gift tax liability and so they did not file a return for that year. We think that is distinguishable from the other petitioners' section 6651 defenses. *See Boyle*, 469 U.S. at 251 ("When an accountant or attorney *advises* a taxpayer on a matter of tax law, *such as whether a liability exists*, it is reasonable for the taxpayer to rely on that advice." (Second emphasis added.)).

We agree with Patricia and the Estate of Lloyd Huffman that they had reasonable cause for their failure to report any gift tax liability. As they noted, the analysis in *Cavallaro v. Commissioner*, T.C. Memo. 2014-189, at \*66–71, *aff'd in part, rev'd in part and remanded*, 842 F.3d 16 (1st Cir. 2016), is instructive. In that case we relied on the same three-part analysis described in *Neonatology Associates, P.A.* for determining whether the taxpayer's reliance on a tax professional was sufficient to avoid liability for penalties and additions to tax. *Cavallaro*, T.C. Memo. 2014-189, at \*71. We will do the same in these cases.

Lloyd and Patricia relied on Ms. Ross-Stearn to advise on their tax liability. Ms. Ross-Stearn was a licensed accountant with many years of experience performing the accounting and payroll function of

**[*45]** Dukes, its affiliates, and the individual family members. She had enough experience to justify their reliance on her advice.

Chet testified that Ms. Ross-Stearn was "most certainly aware" of the RTP agreements and his decision to exercise his rights under the agreements in 2007. He also testified that Ms. Ross-Stearn would have had knowledge of the RTP agreements because she "effectively served as Dukes'[s] accounting department" and was integral to the proposed acquisition by Hanwha. On that basis, we find that Ms. Ross-Stearn was provided all the necessary information which would have alerted her to a potential gift tax liability owing from Lloyd and Patricia.

Finally, Patricia testified at trial that she "[t]otally relied" on Ms. Ross-Stearn to advise on tax matters. She further testified that she had no income or gift tax training whatsoever. She explained that had there been any indication that a gift tax return should be filed, she would have made the necessary efforts to do so. On the basis of that testimony, we agree that Lloyd and Patricia relied in good faith on Ms. Ross-Stearn. They therefore acted with reasonable cause in their failure to file a gift tax return and failure to pay the outstanding gift tax. Therefore, Patricia and the Estate of Lloyd Huffman are not liable for the additions to tax. Cindy and the Estate of Chet Huffman, as well as Dukes, are liable for the additions to tax as stated above.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*